1

```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF SOUTH CAROLINA
 2                          AIKEN DIVISION

 3   ------------------------------

 4   UNITED STATES OF AMERICA              CR NO.: 1:12-333
                                           Columbia, SC
 5      -vs-                               May 8, 2013

 6   TERRANCE LAMAR WIGGINS,

 7           Defendant

 8   ------------------------------

 9

10               BEFORE HON. MARGARET B. SEYMOUR
             SENIOR UNITED STATES DISTRICT COURT JUDGE
11                      SENTENCING HEARING

12   APPEARANCES:

13

14   FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                          UNITED STATES ATTORNEY
15                        BY:  JULIUS NESS RICHARDSON
                          Assistant United States Attorney
16                        1441 Main Street
                          Columbia, SC  29201

17   FOR DEFENDANT:       BYRON E. GIPSON, ESQ.
                          P.O. Box 1825
18                        Orangeburg, SC  29115

19

20   COURT REPORTER:      DANIEL E. MAYO, RDR
                          Certified Realtime Reporter
21                        901 Richland Street
                          Columbia, SC  29201

22

23              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

24

25
```

2

1          THE COURT:  Mr. Richardson?

2          MR. RICHARDSON:  Thank you, your Honor.  We're back

3     in the case of United States versus Terrance Lamar Wiggins,

4     criminal number 1:12-333.  We're here for Mr. Wiggins'

5     sentencing.  The government has reviewed the presentence

6     report and has no objections.

7          THE COURT:  All right.  Mr. Gipson, good afternoon.

8          MR. GIPSON:  Yes.  If it please the court, your

9     Honor, we do have a few objections to the presentence report

10    and we have provided those to the probation, your Honor, so

11    they could --

12         THE COURT:  Have you had an opportunity to review the

13    report with Mr. Wiggins?

14         MR. GIPSON:  I have, your Honor.

15         THE COURT:  And, Mr. Wiggins, have you had ample

16    opportunity to review this report with Mr. Gipson?

17         DEFENDANT:  Yes, ma'am.

18         THE COURT:  All right.  Mr. Gipson, I'll hear from

19    you at this time on your objections.

20         MR. GIPSON:  Yes, ma'am.  If it please the court,

21    after consulting with Mr. Wiggins, the first -- the matter

22    that we mentioned in terms of the attributable drug weight, we

23    will withdraw that particular objection, your Honor.

24         THE COURT:  So the defendant had objected to

25    paragraph 84 and 109 which stated that he was being held

1    accountable for 200 kilograms of cocaine.  You are withdrawing

2    that objection?

3              MR. GIPSON:  Yes, ma'am.

4              THE COURT:  Mr. Wiggins, you agree with that?  Mr.

5    Wiggins, do you agree with that?

6              DEFENDANT:  Not really.

7              MR. GIPSON:  Then we will proceed, your Honor.

8              THE COURT:  All right.  So the objection is that you

9    disagree with being held accountable for 200 kilograms of

10   cocaine.

11             DEFENDANT:  Yes, ma'am.

12             MR. GIPSON:  Yes, ma'am.  That's his objection, your

13   Honor.

14             THE COURT:  All right.  Mr. Richardson?

15             MR. RICHARDSON:  Your Honor, I think from the

16   government's perspective, your Honor sat through the trial and

17   I think you heard from quite a few of the individuals that

18   testified, Manuel Soto-Gonzalez as well as Christopher Davis.

19   Taking those two alone just the trial testimony that was

20   presented exceeded 200 kilograms of cocaine.  We think both of

21   those were highly credible individuals who have testified

22   before your Honor and your Honor was able to evaluate their

23   testimony.

24             That testimony alone before your Honor that the jury

25   heard is sufficient to exceed the 200 kilogram threshold.

4

1    There is other testimony, obviously, that supports that and

2    there are other individuals who provided information about

3    cocaine dealing that Mr. Wiggins did with them that would

4    actually be in addition to that 200 kilograms.  I think

5    probation correctly took the conservative end of that because

6    anything over 150 kilograms doesn't make any difference with

7    respect to the guidelines.  I think they appropriately used

8    what your Honor heard about.  There are a number of paragraphs

9    in the presentence report that describe the extent of his drug

10   dealing, you know, a drug dealing enterprise that led to the,

11   you know, accumulation of $750,000 in cash, a Land Rover, a

12   Camaro, a motorcycle, the house with a pool, et cetera, that

13   your Honor heard lots about during the trial.

14        We think the 200 kilograms here is a very low

15   estimate, actually, comes as only a fraction of what Mr.

16   Wiggins was actually involved with.  It's been laid out in the

17   presentence report, I think probation addressed this

18   appropriately.  The final thing I'll add, your Honor, a flat

19   denial is not sufficient for purposes of an objection.

20        THE COURT:  All right.  Mr. Gipson, what evidence do

21   you have as to the amount of drugs sold and what is your

22   testimony with regard to the inaccuracy or unreliability of

23   the information provided in the presentence report?

24        MR. GIPSON:  Your Honor, I've now been advised that

25   Mr. Wiggins would like to withdraw that particular objection,

5

1  your Honor.

2           THE COURT:  All right.

3           MR. GIPSON:  Make sure that -- I'd ask if the court

4  would consider just asking him on the record, because I just

5  want to make sure --

6           THE COURT:  Mr. Wiggins, initially you had objected

7  to paragraph 84 and 109 of the presentence report.  In those

8  paragraphs you are being held accountable for 200 kilograms of

9  cocaine.  Are you --

10          DEFENDANT:  I just feel that --

11          THE COURT:  -- withdrawing your -- are you

12 withdrawing the objection?

13          DEFENDANT:  Yes.  I feel withdrawing, because anybody

14 could say anything about what --

15          THE COURT:  All right.  So Mr. Gipson as your

16 attorney will now have to present evidence to convince me that

17 that 200 kilograms is inaccurate or unreliable.  And what is

18 the evidence for that?  Mr. Gipson, do you need more time to

19 speak with your client?

20          MR. GIPSON:  Just only briefly, your Honor.

21          (Mr. Gipson and defendant confer)

22          THE COURT:  Let me just say that in developing the

23 presentence report to establish the drug amounts that are

24 attributable to Mr. Wiggins the probation officer relied on

25 the trial testimony provided by Christopher Davis and Manuel

1    Soto-Gonzalez.  I listened to the testimony of both of those

2    individuals.  As described in paragraph 82 of the presentence

3    report, Mr. Davis testified that he distributed at least

4    20 kilograms of cocaine to Mr. Wiggins from 2007 and 2008,

5    Mr. Soto-Gonzalez testified that he distributed between 180 to

6    200 kilograms of cocaine to the defendant from 2008 through

7    2010.  As far as I can tell from the presentence report no

8    alternative amount has been provided to the court.  I find

9    that the testimony of Mr. Davis and Mr. Soto-Gonzalez was

10   credible, unless you can provide me with some evidence to the

11   contrary.

12          MR. GIPSON:  Your Honor, I do not have any evidence

13   to the contrary, your Honor.  And, again, as participating in

14   the trial I understand that that 150 kilogram threshold

15   essentially is a threshold and that information was present

16   through the presentence report and through the testimony of

17   trial, your Honor.

18          THE COURT:  Okay.  Do you have anything else, Mr.

19   Wiggins, you would like to present to the court with regard to

20   that objection?

21          DEFENDANT:  Basically I don't have nothing to say.

22   You all feel they told the truth.

23          THE COURT:  I beg your pardon?  I can't hear you.

24          MR. RICHARDSON:  Your Honor, if he's going to testify

25   we would ask him be placed under oath and take the witness and

1    be subject to cross-examination.

2              (Mr. Gipson and Mr. Wiggins confer)

3              THE COURT:  Well, let me let Mr. Gipson speak with

4    him and find out what it is he wants to present in his defense

5    or to support his position with regard to that objection.

6              (There was a pause in the proceedings)

7              THE COURT:  Mr. Richardson, I think the defendant is

8    entitled to make a statement with regard to the controverted

9    issues in this presentence report, if he wants to.  He can

10   make a statement.

11             MR. RICHARDSON:  Your Honor, without being placed

12   under oath that is not -- that would not be evidence, I don't

13   believe, for your Honor to rely upon.  He can make a statement

14   with respect to sentencing, and he's obviously entitled to do

15   that.

16             THE COURT:  But he can make a statement if he's

17   placed under oath, yes.

18             MR. RICHARDSON:  That's correct.  But all we're

19   saying, he would need to be placed under oath and subject to

20   cross-examination on its reliability.

21             THE COURT:  All right.  Mr. Gipson?

22             MR. GIPSON:  Your Honor, I don't believe he wants to

23   make a statement.  I am informed again that he would like to

24   withdraw that particular objection.

25             THE COURT:  Well, let me just say that even if he

1    does withdraw it I've considered the objection because you've

2    raised it, I also understand what the drug weight is based on,

3    the testimony of Mr. Davis and Mr. Soto-Gonzalez.  I listened

4    to their testimony and find it to be credible.  Therefore, I'm

5    going to overrule the objection.

6            MR. GIPSON:  Yes, ma'am.

7            THE COURT:  Okay.  What's the next objection?

8    Paragraph 86 and 87?  That is an objection to the four level

9    enhancement.

10            MR. GIPSON:  Yes, ma'am, for obstruction of justice,

11    your Honor.

12            THE COURT:  This is just the four level enhancement,

13    not the obstruction of justice.

14            MR. GIPSON:  Yes, ma'am.  In terms of the role, your

15    Honor, I apologize, it's our position, your Honor, that under

16    that particular objection Mr. Wiggins has admitted that he

17    sold drugs during some periods of time and that in his

18    proffer, your Honor, that was admitted to, your Honor.  And

19    even if through the testimony that was given during the trial

20    there was testimony that he either bought from

21    Mr. Soto-Gonzalez or that at points in time Mr. Davis, he

22    purchased things from those two, your Honor.  I think that to

23    suggest that he was essentially a -- we were inferring that he

24    would had to have been a higher up participant, your Honor,

25    there was never any information requested from either of these

1    gentlemen to say whether he worked for them, whether there is

2    somebody particular Mr. Wiggins was working for.

3         And just to presume that he was a higher level

4    participant because of -- essentially because of the amount of

5    money that -- I think that the money that was accumulated and

6    the money that was seized as a result of Mr. Wiggins' giving

7    them information about where those moneys were, I think that's

8    part of the reason why he's looked at in terms of a person in

9    a higher role.  There is a significant amount of drugs that

10   we're talking about, but I don't know that the testimony that

11   was given suggests -- does anything more than suggest he could

12   be a higher level participant, your Honor.

13        I don't think there was -- they suggested he directed

14   any particular activities, you know, for four or more or five

15   people or more.  I think the information was suggested at some

16   point in time there might have been two people who had bought

17   from him and worked for him that testified here in court, your

18   Honor.  But I think that was the extent of what was provided.

19        So I suggest that the enhancement there is not

20   necessarily proper.  Again, we're aware of that 150, you know,

21   kilogram number that's been placed out there, we're aware of

22   the substantial amounts of money, but I think the testimony we

23   heard here in court didn't suggest that he is a higher level

24   participant, your Honor.

25        THE COURT:  All right.  Thank you.

1    MR. RICHARDSON:  Your Honor, again, turning back to

2    probation here, and I think they sum it up exceedingly well in

3    describing the extent of the offense conduct here.  And I'm

4    looking on page three of the addendum, the first full

5    paragraph beginning at the second sentence, where probation

6    explained that throughout the description here the individual

7    who provided information on Mr. Wiggins explained that he

8    utilized a wide array of people to sell guns for him.  The

9    names that are listed there, Mr. Washington Mr. Dunbar,

10   Mr. Skeen --

11    MR. GIPSON:  You said guns, sold guns.  I just --

12    MR. RICHARDSON:  I apologize.  Cocaine.  I'm

13   referring to cocaine.

14    MR. GIPSON:  Thank you.

15    MR. RICHARDSON:  And certainly this is a reference

16   toward cocaine.  There is evidence that he did supply guns to

17   people that were distributing narcotics for him, that's also

18   relayed in the presentence report.  But this was specifically

19   about using individuals to distribute narcotics for him.  So

20   all of those witnesses, your Honor, establish he was running a

21   drug organization in and around Barnwell.

22    But you don't even have to rely just on them.  In

23   fact, Mr. Wiggins' own statements establish that that is what

24   took place.  Mr. Wiggins stated repeatedly, including in

25   various reports that your Honor heard about during the

December 4 hearing before your Honor, where you took testimony and heard evidence that Mr. Wiggins described using family members to deliver drugs, to open up the house, to weigh out the supply money -- or not money, that was referring in particular to his brother Edwin and others.  That those individuals were part and parcel of the drug enterprise that he was running.

We think there's extensive evidence and, in fact, as much evidence as seen in these cases, that Mr. Wiggins wasn't just a middleman in this process but employed in a sense a number of people to distribute narcotics for him.  It's laid out in detail throughout the offense conduct, the individuals he was using as part of his drug business.  We think that is exactly what the leadership role envisions.  Mr. Wiggins is the prototypical leader in this type of a drug organization.

MR. GIPSON:  Your Honor, I suggest it's up to the government to present its case the way it chooses to, but, your Honor, he talks about these folks that were a part of this enterprise.  The only person who testified during this trial that we had Earl Davis who testified who said that at some point in time he worked with Mr. Wiggins.  I think the other information, your Honor, and I'd say is -- credibility can be questioned of the persons who may have provided other information.  Because, number one, they were never called to trial to be cross-examined; two, oftentimes people place

1    information in their proffers and speak about information

2    that's not necessarily true and they are subject to being

3    cross-examined about it.  And the question and the problem Mr.

4    Wiggins has with that is the fact if there are people who may

5    speak on these things we can never speak to or never

6    particularly come in and say what they say is not justified,

7    your Honor.

8            I just, again, he's admitted to the things that he

9    did and that he specifically did during many of the

10   conversations that he had with law enforcement, your Honor.

11   But the enhancement I just don't think is proper just based on

12   the testimony that we received.  He did buy, he did sell, and

13   there are I think a minimum number of people who came in and

14   spoke about him actually controlling an enterprise.

15           THE COURT:  It seems to me that according to the

16   probation officer's report there was evidence uncovered during

17   the investigation that indicated that Mr. Wiggins functioned

18   as an organizer or leader in the drug trafficking conspiracy.

19   There were several cooperating witnesses and coconspirators,

20   including Christopher Jefferson, Eugene Folk, Frederick

21   Pressie, Manuel Soto-Gonzalez, Christopher Davis, and there

22   was a confidential source of information, and all of these

23   people indicated that Mr. Wiggins had other cocaine dealers

24   such as Shawn Washington, Roger Dunbar, and Randolph Skeen

25   make cocaine transactions on his behalf.

1        In addition, Mr. Wiggins was involved in coordinating

2   the actions of his brother Edwin Wiggins and his half brother

3   Cawarren Jenkins to leave drug proceeds in his residence or

4   deliver cocaine to his customers.  And Mr. Wiggins has

5   admitted the exercise, that he exercised control over his

6   siblings when he was interviewed by the Special Agent David

7   Fellerman.  So based on that information it would appear that

8   the enhancement would be appropriate if he was involved with

9   exercising some decision making authority over all of these

10  individuals.

11       MR. GIPSON:  Yes, ma'am.

12       THE COURT:  And do you have any evidence to the

13  contrary that he was not involved with these individuals?

14       MR. GIPSON:  I do not, your Honor.

15       THE COURT:  Do you have any evidence that would

16  suggest any of these individuals were not being truthful?  Do

17  you have anything to --

18       (Mr. Gipson and Mr. Wiggins confer)

19       MR. GIPSON:  No, ma'am, we do not.

20       THE COURT:  The objections to paragraph 86 and 87

21  with respect to role adjustment is overruled.

22       The next objection has to do with paragraph 88, 89

23  and 90, adjustment for obstruction of justice.  The defendant

24  objects to these paragraphs regarding the obstruction of

25  justice enhancement.  And the basis for the paragraph, or

1    basis for the enhancement is the fact that based on the

2    evidence he engaged in obstructive conduct by concealing or

3    directing other persons to conceal evidence that was material

4    to the investigation and you are objecting to that.  What is

5    your evidence to the contrary?

6           MR. GIPSON:  Well, your Honor, my evidence to the

7    contrary, I mean, is as we look at the addendum that was

8    provided your Honor, the sentencing report suggests that he

9    repeatedly provided false statements to federal agents

10   regarding, you know, his dealings during the -- dealing with

11   drug trafficking.  I suggest to the court that that's not

12   true, your Honor.  He met with agents for at least ten plus

13   hours and went through multiple just pages and pages of

14   information that dealt with his involvement, others'

15   involvement, made at least three calls to attempt to set up

16   controlled buys.  He did several things, your Honor.

17          I think the piece that they are really referring to

18   is the fact that early in the process he was asked during one

19   of the proffer sessions if there was any other money that was

20   there and he suggested there may not be.  After we met and

21   spoke briefly Mr. Wiggins went back and met with them and gave

22   them all of the information as to where the money could be

23   found, and then they confiscated the additional moneys, your

24   Honor.  I think that's kind of the crux what of what we're

25   speaking of.

1    He gave them that information, your Honor, they

2    confiscated moneys, and as the court knows, as Mr. Richardson

3    has mentioned, there have been over -- has been over $750,000,

4    or close to it, confiscated in this case.  When the police

5    came to his residence, your Honor, he told them where the

6    things were in the residence and he later told them where the

7    other moneys were and so that they could confiscate those, as

8    well.  That was done, your Honor, in an attempt at that point

9    in a proffer session, in a series of proffer sessions wherein

10    he gave them information and he truthfully gave them the

11    information about where his assets were.

12    I think the piece that kind of stands out here is

13    when you look at the presentence report, and also I'd refer

14    back to the actual date of the actual investigation -- the

15    polygraph that was attempted by Agent Fellerman, your Honor,

16    that was on 27th, I believe, of November.  And in paragraph

17    four of his particular report Agent Fellerman says that Mr.

18    Wiggins was interviewed regarding his brother Edwin's

19    involvement in this drug trafficking organization and stated

20    the following.

21    That was really the crux of what they wanted to know,

22    just what was Edwin's involvement, your Honor.  It wasn't

23    about all of these other matters that the presentence report

24    suggests were obstructive, it was about this one particular

25    matter, and that doesn't -- and that was the question, your

1    Honor.  And because the court determined at that point that he

2    was not completely forthright about that one issue that's what

3    threw out the actual -- that's what allowed his proffer to be

4    used against him at trial.

5            And I would suggest that's the piece where he was not

6    truthful.  If he wasn't truthful, that's the piece where he

7    wasn't truthful.  Not about the other matters that probation,

8    excuse me, or that's being suggested in the PSR.  He gave them

9    this information and he gave them everything and his

10   information actually led to the confiscation of all of these

11   assets, your Honor.  So I suggest that he was absolutely

12   truthful, Judge.

13           In these situations sometimes it takes multiple

14   sessions to meet with people in order for them to understand

15   fully what -- what's required of them if they are going to

16   proceed and cooperate.  And this is no different than many

17   other situations.  They met multiple times.  He gave, again,

18   hours and hours of testimony, your Honor, to them.  And that

19   ultimately, Judge, is what was used here in trial to -- it was

20   used to convict him, as well, just some of his own words.  I

21   suggest obstruction.  It's -- he gave them the information and

22   he gave -- and the giving of that information was subsequently

23   found to be true because they found the moneys exactly where

24   he said they would be found.

25           THE COURT:  Mr. Richardson?

1          MR. RICHARDSON:  Your Honor, two things here.  Your

2    Honor on December 4 of 2012 already found that Mr. Wiggins

3    lied to federal agents as part of the investigation.  That was

4    the finding you made with respect to the breach of the

5    proffer.  That standing alone is sufficient for an obstruction

6    enhancement to apply.  I don't really think we have to go any

7    further than that.  That's the simplest way.  Your Honor

8    already made that finding, you held a full hearing on that on

9    December 4, and we would rely upon the evidence we presented

10   there.

11         The other issue that you raised and the probation

12   relied upon was that shortly after the arrest Mr. Wiggins

13   called his brother and directed him to go to remove evidence

14   in order to obstruct justice, is the government's position.

15   Probation I think recounts that.  We think that the lying to

16   federal agents and trying to destroy evidence is exactly what

17   obstruction is.

18         THE COURT:  All right.  In the United States

19   Sentencing Guidelines Section 3C1.1, that section requires a

20   finding that the defendant should receive the obstruction of

21   justice enhancement, because specifically the application note

22   4D of 3C1.1 provides that obstructive conduct includes

23   destroying or concealing or directing or procuring another

24   person to destroy or conceal evidence that is material to an

25   official investigation or judicial proceeding.  The note

1    further -- application note 4G further identifies as

2    obstructive conduct providing materially false statements to a

3    law enforcement officer that significantly obstructed or

4    impeded the official investigation or prosecution of the

5    offense.

6         It would appear that the evidence would support both

7    of those provisions, that he directed or procured another to

8    destroy or conceal evidence, and also that he provided

9    materially false information to a law enforcement agency.  Do

10   you have anything else, Mr. Gipson?

11        MR. GIPSON:  No, your Honor, we don't wish to present

12   any additional testimony.  I would just suggest that with the

13   information that was offered the question is whether or not

14   it's significantly impeded the investigation of this matter,

15   your Honor.  And with that matter, Judge, with all of the

16   other information that we have spoken about and the court has

17   heard about, our position is that one portion of information

18   that he cured within a couple of weeks of making that

19   statement to them, your Honor, I don't know that that impeded

20   the progress of their investigation.

21        Your Honor, this investigation has been vast and it's

22   gone in several different directions, and that one piece of

23   evidence, your Honor, I suggest did not --

24        THE COURT:  There's more than one portion.  You're

25   leaving out the fact he asked someone to conceal evidence.

1          MR. GIPSON:  And it's been my position -- I've

2    listened to all of those phone calls, your Honor.  I was

3    provided those phone calls and listened to them.  There was

4    conversations about moneys, and I don't know that there was

5    ever a direct request that somebody move money, your Honor.

6    That is my position, your Honor.  Just in listening to those

7    phone calls multiple times in preparation for trial and

8    actually going back even, you know, through preparing for this

9    hearing, your Honor.

10          THE COURT:  All right.  The objection is overruled.

11          MR. GIPSON:  Thank you.

12          THE COURT:  The next objection is paragraph 91,

13    adjustment for acceptance of responsibility.

14          MR. GIPSON:  Yes, ma'am.  And, just briefly, in

15    reference to acceptance of responsibility, again, through

16    these multiple meetings, your Honor, over ten hours of

17    meetings which took place with the government, your Honor, Mr.

18    Wiggins was clear about the fact that he accepted

19    responsibility.  I think the issue was whether or not he was

20    going to implicate any family members in the matter.  And he

21    always said this is something that I did, was my

22    responsibility, I did these things.

23          And he never tried to shirk responsibility, he never

24    tried to place it on anyone else.  He never tried to say well,

25    this person made me do it or I was forced to do this, or I

1    was, you know, pushed into doing these things.  He always said

2    he did these things.  And, your Honor, he chose to go to trial

3    and after choosing to go to trial, being found guilty, your

4    Honor, he's always maintained that this is something that, you

5    know, I particularly did and the responsibility lies with me.

6         I know the court can, if it chooses, determine that

7    he did accept responsibility even though he's been found

8    guilty.  And, your Honor, in those proffer sessions, all of

9    those proffer sessions he told what he did.  He said I did

10   these things, I sold this, I did this, I did this, I did this.

11   It was always an I.  And he's been clear about these things

12   throughout, and I accept he has accepted responsibility and he

13   continues to accept responsibility although he chose to go it

14   trial.

15        THE COURT:  Anything else from you, Mr. Richardson?

16        MR. RICHARDSON:  Not unless you have questions, your

17   Honor.

18        THE COURT:  Well, it appears that the defendant

19   engaged in obstructive conduct by breaching his proffer

20   agreement, by failing to disclose his full knowledge of and

21   involvement in drug trafficking activities.  The objection is

22   overruled.

23        MR. GIPSON:  Thank you, your Honor.  I believe that's

24   all of our objections at this point.

25        THE COURT:  All right.  There being no further

1    objections, as findings of fact of this court for the purpose

2    of sentencing the court finds that the statutory provisions

3    are as follows:  Count one is 20 years to life, count three is

4    five years to life consecutive to any other term of

5    imprisonment, and count four is ten years.

6          Supervised release on count one is at least ten

7    years, count three not more than five years, count four not

8    more than three years.  The fine on count one is $20 million,

9    on count three is $250,000, and count four $250,000.  The

10   special assessment fee is $100 as to each count one, three and

11   four.

12         The guideline provisions are as follows:  The total

13   offense level is 43, the criminal history category five.  The

14   guideline range is life imprisonment as to counts one and

15   four, 60 months imprisonment to run consecutive to any other

16   term of imprisonment imposed as to count three.

17         At least ten years of supervised release as to count

18   one, two to five years of supervised release on count three,

19   and one to three years of supervised release as to count four.

20   There is a $300 special assessment fee.

21         Are there any objections as to the statutory

22   provisions or the guideline provisions?

23         MR. RICHARDSON:  None, your Honor.

24         MR. GIPSON:  No, ma'am.

25         THE COURT:  The court adopts the previously stated

1   provisions.  Mr. Gipson, I will hear from you at this time

2   with regard to the sentence to be imposed in this case.

3              MR. GIPSON:  Thank you, your Honor.  If it please the

4   court, I'll speak briefly, your Honor, then I believe there

5   are just four family members who are here who would like to

6   speak on his behalf if the court would allow.  Those members

7   will be, your Honor, Pastor Michael O'Neil, Joyce Foust who is

8   his aunt, his mother Frances Brown and, lastly, his sister

9   Tamara Anderson.

10             Your Honor, I suggest to the court, understanding

11  what the guideline range is, I ask the court consider varying

12  from the guideline range because of some of the facts that we

13  talked about before, but I'll just briefly explain to the

14  court my position.

15             When you look at the guideline factors, your Honor,

16  there are several ways that his criminal conduct can be

17  deterred without imposing a life sentence, your Honor.  Mr.

18  Wiggins, your Honor, has been in jail since April of last

19  year.  Your Honor, he's got three children, he's got one who

20  was born while he was actually in jail and never been able to

21  physically touch that child, your Honor.

22             I suggest that understanding that we have essentially

23  in this court a -- in this case, your Honor, a 20 year minimum

24  he's got to -- mandatory minimum and then a five year

25  consecutive term and we're looking at 25 years.  Your Honor,

1  by my calculation it goes to 300 or so months, your Honor.

2  That's something that the court, it seems, would have to

3  impose in this case.  I suggest to the court that that is

4  reasonable in this matter.  Because there has been or it's our

5  position that there has been acceptance of responsibility.

6          It's our position that during those hours and hours

7  of proffer sessions, your Honor, the government received vast

8  amounts of information.  Quite frankly, if he had cooperated

9  and chosen not to go to trial, your Honor, he would have been

10 in a position similar to Manuel Soto-Gonzalez and some of the

11 others who were able to testify and the give information and

12 work for a downward departure.

13         I know that's not where we stand in this particular

14 case, your Honor, but the government still is able to make use

15 of all of the information that Mr. Wiggins gave to them, your

16 Honor, and they are able to do this.  And I understand, you

17 know, with proffer agreements they have that ability, I

18 understand it's a contract and they have the ability if

19 there's a breach to proceed as they choose to proceed.  I

20 understand all of those things.

21         But I'd ask that the court consider a variance, that

22 it sentence him underneath something less than life, your

23 Honor.  And that situation would at least allow Mr. Wiggins to

24 at some point in time be able to -- he can pay his debt back

25 to society, your Honor.  He can -- has worked before in the

1    past your Honor.  He's done other types of work.  But it would

2    at least allow him to have a chance and some kind of glimmer

3    of hope to get back to his family.

4         Your Honor, 25 years, 30 years, those are large

5    numbers, especially for a man essentially 33 years old.  Your

6    Honor, that's a generation and a half.  And it's our position

7    that with the information that he's given to the government

8    he's at least shown that he cares about -- he's given them

9    information that they can use to bring others to justice.  And

10   that alone, your Honor, in some lights allows them -- he's

11   chosen to plead guilty to essentially qualify for acceptance

12   of responsibility and other manners of departing from his

13   sentence.

14        We just ask that you consider that factor, your

15   Honor, consider the fact that he's been in the bad situation

16   here, your Honor, and I believe that he's tried to do what he

17   can to cooperate.  And although he did choose to go to trial

18   he did so, your Honor, but he, through that process preceding

19   going to trial he did accept responsibility for what he had

20   done and what he -- and the pain that he had caused to the

21   family and others, your Honor.  And I'd ask the to court

22   consider those things.

23        Briefly, your Honor, he again assisted in giving them

24   all the information about assets where his three-quarters of a

25   million dollars in assets were seized, your Honor.  I think

1    that that shows, again, that he has some respect for law

2    enforcement.  When law enforcement came to the home he told

3    them where things were in the home, your Honor.  It speaks to

4    the way -- the fact that he was raised well.  He made a bad

5    decision to go down the road of selling drugs and to

6    participate in this type of enterprise, but he's got lots of

7    family members who are here, your Honor, who have come to

8    speak on his behalf and love him dearly, and who understand

9    that he's committed a crime.

10           He understands that, your Honor, and I know he wants

11   to speak to the court, address the court.  But I believe that

12   a sentence of 30 years or even if you look at those guidelines

13   and look at a level 40 as opposed to a level 43, even a level

14   41, your Honor, there are ways that a sentence can be

15   constructed that would allow him to pay his debt back to

16   society.  Because that is an extremely long time to pay one's

17   debt, which he has to pay because he was found guilty of these

18   things, your Honor.

19           But I just ask that you consider something underneath

20   life to give him that glimmer of hope.  I suggest to the court

21   that he used drugs extensively at one period of time and that

22   he had a problem with cocaine, your Honor.  I'd ask the court

23   consider, you know, during the sentence he be screened for the

24   drug treatment program, your Honor, and anything vocational he

25   may qualify for because those things can help him in the

1    future.

2          But I just ask that you consider the fact that he

3    did, aside from choosing to go to trial, your Honor,

4    everything that he did preceding trial lined up for somebody

5    who had cooperated and who would have been one of those

6    witnesses that was testifying as opposed to a defendant

7    sitting here at trial.  And but for that decision he would

8    still be in the position that many are to receive some of

9    those benefits, and I'd ask the court consider that, your

10   Honor.

11          THE COURT:  All right.  Thank you.

12          MR. GIPSON:  I'd ask if the court would allow Pastor

13   Michael O'Neil to come forward.

14          THE COURT:  All right.

15          PROBATION OFFICER:  Your Honor, may I approach?

16          THE COURT:  You may.

17          (There was a pause in the proceedings)

18          THE COURT:  All right.  Thank you.  Would you give us

19   your name?

20          PASTOR O'NEIL:  Pastor Michael O'Neil.

21          THE COURT:  I'll hear from you at this time.

22          PASTOR O'NEIL:  Your Honor, to the court, to all the

23   officials here, to the family, to Mr. Wiggins, I come standing

24   as a pastor, Terrance's pastor, his family's pastor, and come

25   here not so much to try and make any type of reckless

1   statements or anything no more than I would very generally in

2   the community.  I work very diligently trying to make our

3   community a more prosperous and productive community.  I've

4   had an opportunity to interact with Mr. Wiggins over the ten

5   years or so that I have been at Rosemary Baptist Church

6   praying with him, encouraging him, trying to guide him in

7   whatever way I possibly can as I do with so other many young

8   mens and young ladies in our community from the schools, to

9   partnering with local churches in our community to try and

10  make a difference.

11          I'm here on behalf of Terrance and his family to

12  plead for a second chance, an opportunity for him to get to

13  know his children, an opportunity for him to be a productive

14  citizen back in the community.  I'm not here to weigh on

15  whether he's guilty or not.  I don't know any of that no more

16  than any information that you have.  But I'm here to support

17  this family, I'm here to support him and encourage him.

18          As the Bible would say, that he that is without sin

19  cast the first stone.  And I know that he's made some mistakes

20  and we all have made mistakes, and I'm not here to cast

21  judgment or either put weight on what mistake weighs more than

22  another one.  But I know that all of us deserve a second

23  chance and an opportunity to make better decisions, to correct

24  our wrongs, to pay our debt to society in whatever way and

25  manner that is possible.

1      I've come before you today to plead for mercy for

2  this young man, that he may be the father that he can't be

3  being behind prison walls, that he could be the son or he

4  could be an inspiration to those ones who are still out there

5  in the community, may not really understand what it is to do

6  the right thing or the penalty for doing those things that are

7  not constructive in society.

8      I come before you today to ask that you would have

9  leniency on him in a way and manner that allow him to be --

10  become an active participant in this community and the church

11  and in the this world in which we living that some young man,

12  some young lady won't travel back down the same road that he's

13  made the mistakes on this far.

14      THE COURT:  All right.  Thank you very much.

15      PASTOR O'NEIL:  Thank you.

16      MR. GIPSON:  Thank you, sir.  Your Honor, next we

17  have his aunt.

18      MS. FOUST:  Your Honor, I thank you for giving me

19  this chance to speak on behalf of my nephew Terrance Wiggins.

20  Terrance, I'd just like to share --

21      THE COURT:  Would you state your name for the record,

22  please?

23      MS. FOUST:  Joyce Foust, F-O-U-S-T.

24      THE COURT:  Thank you.

25      MS. FOUST:  Terrance on many occasions, by working in

1  his yard, asked me to come over for advice on how he should

2  plant things.  And during those conversations we talked about

3  family, his love for his family and his love for his children.

4  Terrance loved to cook, and on many occasions he would cook

5  and he would invite family members over.

6         And also during conversations Terrance shared with me

7  what he wanted to do with his life.  He told me that he was

8  interested in becoming a chef, and I encouraged him to look

9  into schools that he could find to attend to bring his dream

10  forth.  And I'm just asking you to take these things in

11  consideration, that he is a family man, that he did have hope

12  and change in turning his life around for the better to do

13  things that would be something to help his community.  I thank

14  you.

15         THE COURT:  Thank you.

16         MR. GIPSON:  Your Honor, coming forth is Frances

17  Brown, who is Mr. Wiggins' mother, and his sister Tamara

18  Anderson standing next to her.

19         THE COURT:  If you would state your name, please.

20         MRS. BROWN:  Frances Renee Brown.

21         THE COURT:  All right.

22         MRS. BROWN:  Honorable Judge Seymour, right now my

23  heart is heavy, it's heavy.  Any parent got a child going

24  through stuff their heart is heavy.  Just -- I just want to

25  talk about my son.  I know everybody picked him to be the

1    worst person in Barnwell County, but he's not the worst person

2    in Barnwell County.  He did make a mistake, Lord, and he knows

3    he made a mistake.  And just the other night he say, momma, I

4    talk to the Lord, he say, a couple days before the -- I talked

5    to the Lord and asked him to make a change in my life.  And I

6    said you know what, Terrance, I say, he did.  I say, you know,

7    sometimes we go through things and the Lord put us through

8    things, trials and tribulations so we can see what we do

9    wrong.  Because if nothing ever goes wrong you -- just running

10   the wrong way.

11       So I say the Lord did, did do it for you.  He did.

12   And I believe the Lord's going to do everything as he told us

13   he's going to do.  Always -- my son get hit by a school bus,

14   he was two years old, and I thank the Lord that's the first

15   miracle he did for us.  Because he could have been gone.  And

16   I always preach to him and say, you know what, Terrance, I

17   say, you got hit by a bus when you was two years old.  I said

18   the other little boy in the hospital just got hit by a car and

19   I say, you know, the Lord blessed you and I say he kept you

20   here for a reason.

21       And I say the Lord is going to get his glory because

22   he didn't -- he didn't allowed you to die.  He allowed you to

23   stay here.  And we all go through trials and tribulations

24   sometimes, and the Lord does that.  But he can open his eyes.

25       And when he was in prison it was some kind of class,

1    sometime I remember, I think it was turn your life around to

2    Christ, turn to Christ, I don't remember, turn to Christ.  And

3    we came, we had lunch with him.  The pastor was there that

4    held the class, and he say to me, he talked to me and he say,

5    you know, I see a difference in your son since he been here.

6          And I know that you hear this, I know you hear it for

7    everybody that comes there about the Lord, but I truly believe

8    this.  Because, like say, I have been telling him this from

9    when he was young.  And all the -- you turn your life around

10   to Christ, you have to give him that opportunity.

11         I know he did wrong.  I'm just trusting and praying

12   and asking you, your Honor, to give him mercy that he don't

13   spend his whole life in prison.  Because when he's in court

14   not too long ago he was told he would leave out of prison in a

15   box.  That's the only way he was going leave prison, in a box.

16   And I don't want that for my children, my son.

17         And I hope from the publicity and that went on in

18   Barnwell County with my son and stuff on the Facebooks, that

19   some child will get alerted from this and open the eyes and

20   see that money is not everything.  Money is the root of all

21   evil.  But the most precious thing in the world is life, a

22   Godly life that you could have being able to walk -- just -- I

23   just -- I'm just putting his life on the mercy of the court

24   that he just get an opportunity.  Because he's not, like I

25   say, he not the monster, he's a son, he's a brother, he's a

1    nephew, he's an uncle, he's a grandson.

2            Now, I'm not going to justify what he did, because I

3    can't.  He don't justify what he did.  He say he made a

4    mistake and only thing he acknowledge the mistake he made is

5    it not only affect his life, it affects everybody around him.

6    And he's hurting for that.  And I know he is.  And I know I'm

7    hurting for that.  But just, Lord, just please find it in your

8    heart that my son do not do life in jail.  Thank you.

9            THE COURT:  Thank you.  Your name, please?

10           MS. ANDERSON:  Judge, I'll take the opportunity to

11   thank you for allowing my mother to get up here and speak in

12   my brother's behalf.  And also allowing us to move it to

13   Wednesday so we could be here.

14           THE COURT:  Give me your name, please.

15           MS. ANDERSON:  Tamara Anderson.

16           THE COURT:  Thank you.

17           MS. ANDERSON:  I know some people may say that a lot

18   of people find God when they go to jail or when they go to

19   prison.  But that is so untrue about my brother.  My family is

20   a praying family.  We constantly pray.  My brother does not

21   know how many nights that I lay before God and pray for him.

22   Because my great grandmother has always told me pray until

23   something happens.

24           And I seen a huge change in my brother before all

25   this happened.  He was a good father to his kids, he made sure

1    that he was in their life.  He was home, just like my aunt

2    say.  We did dinners together, we did Thanksgiving dinner

3    together, we did Christmas together.  He's a good cook.  He

4    sometimes tried to outdo me with his cooking.  But we were a

5    close-knit family before all this happened.

6          And just like my mother say, sometimes things have to

7    happen before you completely change.  Me and my mother was on

8    the way to church one day, not to the church that she usually

9    go to, and he called and he said mom, what time does church

10   start?  And we were, like my mom, he's not going to church

11   this morning, but he actually got up to go to church.  That

12   may not sound a lot to you, but to us that is a huge, huge

13   accomplishment.  He went to church.

14         He was actually changing his life before all this

15   happened.  Just like my mother say, please have mercy on him.

16   We do not want him to spend life in prison.  And I thank you

17   for the opportunity to get up here.  Thank you.

18         THE COURT:  Thank you.

19         MR. GIPSON:  Lastly, your Honor, Mr. Wiggins would

20   like to address the court.

21         THE COURT:  All right.  Mr. Wiggins, I'll hear from

22   you at this time with regard to the sentence to be imposed in

23   your case.

24         DEFENDANT:  Your Honor, I thank you on my behalf to

25   speak to the court.  First I would like to thank God for the

1    opportunity to still be here and not loss in life, killed

2    behind drugs, he still give me a chance to be living.  I'd

3    like to apologize to my family for all I put them through.

4    I'm not perfect, I made a lot of mistakes in life.  When they

5    came and saying about me was the God's honest truth.

6            I lost my daddy when I was in elementary school.  I

7    never had a father figure, only had my mother.  She gave me

8    the chance to do the right thing but I chose the wrong path.

9    Now I'm here standing before you asking for mercy on my

10   situation.

11           I have three kids, newborn I never seen.  And

12   basically only I can say I'm sorry.  I just want another

13   chance at life.  Just don't take my life away.  Whatever is

14   your will, whatever you can do to help me out, whatever you

15   can do now or the near future, anything you can find out and

16   get me back home close to my family so they don't forget about

17   me.

18           I'm not the person that people came up here and say I

19   was.  I made -- I sold drugs, I'm not a -- I'm not -- I'm not

20   just a killer, a gangbanger.  I have a good heart and I always

21   there for my family, whoever needed I was there.  I never

22   could say no.  And I'm -- I want to tell the court I'm sorry

23   for what I did.  I apologize.

24           THE COURT:  All right.  Thank you very much.

25   Anything else from you, Mr. Gipson?

1          MR. GIPSON:  No, ma'am, that's all we have.  We just

2    ask you consider a sentence underneath the advisory

3    guidelines.

4          THE COURT:  All right.  Mr. Richardson?

5          MR. RICHARDSON:  Thank you, your Honor.  This is a

6    case that your Honor has lived with almost as long as I have.

7    It goes back to Christopher Davis' case that your Honor saw

8    through Mr. Wiggins' part of that.  And this is an instance

9    where there is no legitimate reason to vary from the guideline

10   sentence.

11         Mr. Wiggins is a large scale drug trafficker.

12   Hundreds and hundreds of kilograms of cocaine, trafficking in

13   Barnwell, Barnwell County area.  He had no legitimate

14   employment, as his presentence report indicates.  He reports

15   one job or maybe two jobs, neither of which are confirmed by

16   anybody that was at that company that he ever worked there.

17         And he's a recidivist.  He's a category five, not

18   category six is the very highest, but the next highest

19   category of criminal history.  Given his guideline range,

20   given the offense conduct range, he would be a lifer under the

21   guidelines even if he had no criminal history, much less

22   having the extensive criminal record that he has involving

23   cocaine, criminal domestic violence, as well as a firearm

24   offense.

25         This is somebody that did it extensively.  More than

1    three-quarters of a million dollars in cash, he had a Land

2    Rover, a Camaro, motorcycles, a variety of restored cars at a

3    nice residence in the Barnwell community.  He had multiple

4    firearms at his residence when he was arrested after the

5    search warrant.  He had an assault rifle, he had a pistol, he

6    had pistol grip shotgun hidden throughout the house.

7              In his attempt to cooperate, as your Honor has

8    already found, he was unable to be truthful, rendering what

9    information he provided virtually useless to the government

10   because of his inability to tell the truth.

11             Your Honor, he's continued throughout the process to

12   refuse to accept full responsibility for what he's done.  Your

13   Honor saw it at the first objection with respect to 200 kilos,

14   in an instance where Mr. Wiggins has dealt far more than that.

15   He won't even accept responsibility even now to the quantity

16   and the scale of narcotics trafficking that he was involved

17   in.

18             Mr. Wiggins begins at an offense level 46.  I've

19   never actually seen a 46 in my experience.  I think that's an

20   extremely high offense level that reflects the extremely

21   serious nature of the crimes he committed.  I think

22   particularly when your Honor combines that with him being a

23   category five criminal history this is not an appropriate

24   instance to vary.

25             Mr. Wiggins asked the court to impose a 300 month

37

1    sentence, is the request he's making.  And in essence that

2    would be a 12 level downward departure from the 46 down to

3    what in essence would be a level 34 in a category five.  We

4    think that's not justified here under the circumstances and we

5    would ask you to impose the guideline sentence.

6           THE COURT:  Anything else?

7           MR. GIPSON:  Nothing, your Honor.

8           THE COURT:  Mr. Richardson, has any of the

9    cooperation that Mr. Wiggins provided useful to government?

10          MR. RICHARDSON:  It has not been, your Honor, because

11   we cannot make use of it.  The difficulty is when someone is

12   untruthful in one part, the other part of what they say is

13   rendered virtually unusable.  And this is an instance where he

14   provided some information, and your Honor heard about some of

15   that information.  We provided testimony about it after he

16   breached his proffer agreement.  And you heard testimony from

17   Special Agent McElwain about it.  But the information that

18   he's provided because he cannot be used as a credible source

19   we can't then make use of it.  We can't use it to do search

20   warrants, we can't use it for indicting someone because he's

21   not a usable witness.

22          I'd also add even to the extent it was theoretically

23   credible he refuses to cooperate.  He's refused to do anything

24   since prior -- since well before the trial.  So to the extent

25   that he provided information it's simply not useful and cannot

1    be useful to government.

2         I mean, I will add, your Honor, as I added before in

3    a variety of cases to you, and I add it here as I always do,

4    if Mr. Wiggins wanted to come in and provide fully truthful

5    testimony, fully truthful debriefing about everything that

6    he's done and we're able to confirm the accuracy of what he's

7    saying and he continues -- doesn't continue lying to us, if

8    we're able to arrange a time to do that, the agents I'm sure

9    would be willing to do it for him to provide that information.

10   And if we were able to use it then obviously we would give him

11   credit for it.  But as it currently stands, he refuses to

12   cooperate, we cannot use the information.

13        THE COURT:  There is a possibility then that if he

14   cooperates and you are able to polygraph him and confirm the

15   information there would be a possibility for a Rule 35?

16        MR. RICHARDSON:  I think there is a possibility, your

17   Honor.  I'll contrast it with a case you are also familiar

18   with, Earl Daniels who appeared before your Honor, part of the

19   same case.  In fact, he testified at Mr. Wiggins' case.  And

20   we appeared before you in that instance and I told you that I

21   thought if he would come in and cooperate, because Mr. Daniels

22   did not lie to law enforcement, he chose to go to trial, he

23   was convicted, and then at that point came in, provided

24   truthful information, he testified during this trial and he's

25   currently serving a life sentence.  I anticipate that as soon

1    as this sentencing is completed that you would see a Rule 35

2    request on that individual.  Because he didn't lie, he was in

3    a situation where he provided information that was useful to

4    the government.

5            That is a possibility for Mr. Wiggins, but it's a

6    much more remote possibility because he has lied.  And the

7    difficulty, as your Honor is well aware, is that once someone

8    begins down that road of lying it is very difficult for us to

9    rely on that information.  Obviously possible.  You have heard

10   testimony from individuals who have failed polygraphs.  I

11   believe in the Sigmund James trial an individual testified,

12   who's name is escaping me, but he testified even though he had

13   previously failed a polygraph and had been untruthful.

14           The government was able to confirm information he was

15   providing and he came clean and provided a full account of

16   what he had done.  So it's certainly possible, I'm aware of an

17   instance where it occurred before, your Honor, but I wouldn't

18   say it is a likely possibility, but it is a possibility.

19           THE COURT:  Thank you.  Anything else, Mr. Gipson?

20           MR. GIPSON:  The only brief part that I would add,

21   your Honor, back in June of last year he did attempt to make

22   three controlled calls with the government.  At that point in

23   time, your Honor, there was an attempt made at that point in

24   time, your Honor, to actively do some things for the

25   government, your Honor.

1    MR. RICHARDSON:  The one thing I would add, your

2  Honor, we do believe he has information on individuals who

3  would be targets, were we able to use his information.  The

4  difficulty is we cannot use the information, so --

5    THE COURT:  Under what circumstances would you be

6  able to use that information if he were to provide it?

7    MR. RICHARDSON:  If he was fully truthful.  And that

8  would obviously require some polygraph, some ways of the

9  government trying to figure out how to verify it.  Just like

10  we have done in other instances where someone is untruthful

11  for some particular reason and fails a polygraph, or is just

12  untruthful, and we're able to determine that, those

13  individuals can be rehabilitated.  It is a much harder process

14  than someone who is writing on a clean slate.

15    But, your Honor, these people all the time who during

16  the course of their cooperation may not have been fully

17  truthful.  However, right now Mr. Wiggins is not cooperating,

18  he has refused to do so.  And so I think we're quite a few

19  steps away from figuring out how to corroborate and confirm

20  whatever information he would provide.

21    THE COURT:  All right.  I'm going to take a brief

22  recess and I'll be right back.

23    MR. RICHARDSON:  Thank you, your Honor.

24    MR. GIPSON:  Thank you, your Honor.

25    (A recess transpired)

1          THE COURT:  You may stand for sentencing.  All right.

2    Mr. Terrance Lamar Wiggins is before the court for the purpose

3    of sentencing, having been found guilty by jury verdict of

4    conspiracy to possess with intent to distribute and to

5    distribute five kilograms or more of cocaine, possession of a

6    firearm in furtherance of a drug trafficking crime, and felon

7    in possession of firearms and ammunition.

8          The subject investigation in this case revealed that

9    Mr. Wiggins was involved in a conspiracy to distribute

10   kilogram quantities of cocaine in Barnwell County and

11   surrounding areas of South Carolina from approximately 2005

12   through 2012.  It's significant in this case that in 2005 when

13   the investigation began there were several cooperating

14   witnesses who detailed their drug activities with Mr. Wiggins.

15   Several witnesses described their multi-kilogram quantity

16   cocaine dealings with Mr. Wiggins.

17         There was a search warrant at Mr. Wiggins' house and

18   during the search the investigators located quantities of

19   marijuana, cocaine, six firearms, numerous rounds of

20   ammunition, $400,000 in U.S. currency, scales and other

21   paraphernalia often used in the distribution of kilogram

22   quantities of cocaine.  Mr. Wiggins' mother's residence was

23   also located across the street where they located more than

24   $180,000 in U.S. currency throughout the house.  Mr. Wiggins

25   has a history of abusing marijuana and cocaine, and he also

1    has a history of abuse of alcohol.

2         The court, having taken all of this into

3    consideration, and having calculated and considered the

4    advisory sentencing guidelines, and having also considered the

5    relevant statutory sentencing factors that are contained in

6    Title 18 United States Cod section 3553(a), has come to the

7    judgment that the defendant, Terrance Lamar Wiggins, is hereby

8    committed to the custody of the Bureau of Prisons to be

9    imprison for a term of life.

10        (Disturbance in the audience)

11        (There was a pause in the proceedings)

12        THE COURT:  This term consists of life as to counts

13   one and 120 months as to count four, said terms to run

14   concurrently, and 60 months as to count three, said term to

15   run consecutively to the terms previously imposed on counts

16   one and four.

17        According to the Fourth Circuit's decision in U.S.

18   versus Kratsas the court finds that when a defendant is facing

19   a sentence of life the court must apply the three part test

20   articulated by the Supreme Court in Solem, advising that an

21   extensive proportionality analysis is required in those cases

22   involving a life sentence.  Applying Solem's first prong, the

23   defendant's offense was extremely grave because drug use is a

24   pervasive, destructive force in American society.  The

25   defendant was not merely a user or even a single distributor

1   of drugs but was involved in obtaining and distributing

2   multi-ounce quantities of crack cocaine and cocaine over a

3   period of multiple years from various sources in the state of

4   South Carolina.  And the defendant distributed at least

5   200 kilograms of cocaine during the course of his involvement

6   in the offense of conviction.

7          Applying Solem's second prong, the court finds that a

8   life sentence for a major drug violation is not

9   disproportionate in comparison with other sentences under the

10  guidelines.  Applying Solem's third prong, the court finds a

11  review of the state statutes within this circuit disclose the

12  existence of similarly severe sentences for narcotics

13  violations of the magnitude involved here.

14         It does not appear that the defendant has the ability

15  to pay a fine, therefore the fine is waived.  The defendant

16  shall pay the mandatory $300 special assessment fee, which

17  consists of $100 on each of his three counts of conviction.

18  The defendant shall forfeit his interest in property as

19  directed in the preliminary order of forfeiture filed April 19

20  of 2013, and the said order is incorporated herein as part of

21  this judgment.

22         Should the defendant be released from imprisonment he

23  will be placed on supervised release for a term of ten years,

24  consisting of ten years as to count one and three years as to

25  counts three and four, said terms to run concurrently.

1          Within 72 hours of release from custody of the Bureau

2    of Prisons the defendant shall report in person to the

3    probation office in the district to which he is released.

4    While he's on supervised release he shall comply with the

5    mandatory and standard conditions of supervision that are

6    outlined in Title 18 United States Code Section 3583(d), and

7    he shall also comply with the following special conditions:

8    He shall participate in a substance abuse treatment program,

9    to include drug testing, as approved by the United States

10   Probation Officer.  Unless he's able to secure stable and

11   verifiable employment he shall participate in a vocational

12   training or work force development program as approved by the

13   United States Probation Office.

14         The findings of fact of the presentence report are

15   adopted as the reasons for the sentence and are incorporated

16   by reference.

17         I'm also making a recommendation to the Bureau of

18   Prisons that he be considered for the intensive drug treatment

19   program at the Bureau of Prisons.

20         Mr. Wiggins, you are advised that a criminal

21   defendant has the right to appeal a sentence in certain

22   circumstances and you should discuss with your lawyer as to

23   whether or not you are entitled to an appeal in this case.

24   With few exceptions any notice of appeal must be file within

25   14 days after judgment in your case is entered.  Do you

45

1   understand?

2            DEFENDANT:  Yes, ma'am.

3            THE COURT:  I'm also going to advise you, Mr.

4   Wiggins, that you take into account the information that was

5   provided at this hearing by the government and there is an

6   opportunity for your sentence to be reduced if you provide

7   truthful information to the government that can be relied on.

8   In that situation, if the government finds that information to

9   be reliable and truthful, they can, if they so find, file a

10  Rule 35 motion in your behalf and ask your sentence be

11  reduced.  Do you understand?

12           DEFENDANT:  Yes, ma'am.

13           THE COURT:  As a result, the motion for variance in

14  this case has been denied.  Is there anything else?

15           MR. RICHARDSON:  Nothing from the government your

16  Honor.

17           MR. GIPSON:  Nothing from the defendant, your Honor.

18           (Recess, 5:42 p.m.)

19

20           I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.

21

22  Date:  9-4-13                      s/  Daniel E. Mayo

23

24

25